FILED
2026 Nov-18 PM 03:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

**UNITED STATES OF AMERICA,**

**v.**

**RODERICK DEWAYNE DUNKLIN,**
Defendant.

**Case No.: 5:25-cr-376-CLM-HNJ**

# ORDER

After holding a suppression hearing, the magistrate judge entered a report, recommending that the court deny Defendant Roderick Dewayne Dunklin's motion to suppress. (Doc. 42). Dunklin timely objected to the report and recommendation. (Doc. 45). The court then held oral argument on Dunklin's objections, and the parties filed supplemental briefs. (*See* Docs. 51, 53 & 54). For the reasons stated within, the court **WILL DENY** the motion to suppress (doc. 22).

—

Dunklin is charged with one count of possession with the intent to distribute 50 grams or more of methamphetamine. (Doc. 1). In his motion to suppress, Dunklin asserts that the Government found evidence supporting this charge through an illegal vehicle search. The magistrate judge agreed with Dunklin that a dog sniff of the vehicle did not provide probable cause for the search. (Doc. 42, pp. 29–47). And the magistrate judge determined that he needn't decide whether, as Dunklin argued, officers had placed a GPS tracking device on the vehicle. (*See id.*, pp. 17–26). Rather, the magistrate judge found that independent sources, such as ALPR alerts, reports from a confidential informant ("CI"), and officers' observations of the vehicle, provided the information about the vehicle's location that the Government may seek to introduce at trial. (*See id.*, p. 26). The magistrate judge also found that officers had probable cause to search the vehicle based on information learned from the CI and the officers' own personal observations of the planned drug buy. (*Id.*, pp. 47–70).

Dunklin objects to many of the magistrate judge's fact findings and to the magistrate judge's recommendation that the court hold that there was probable cause to conduct a warrantless search of the vehicle. The court will address Dunklin's objections in turn.

**A. Fact Findings**

Dunklin first objects to the magistrate judge's recitation of the facts on pages 2 to 17 of the report and recommendation. (Doc. 45, pp. 1–8). Dunklin specifically objects to the magistrate judge's findings that (a) "the CI had provided valuable information in the past," (b) Dunklin was the person communicating with the CI, and (c) Tyishia Pelt was Dunklin's girlfriend. (*Id.*, p. 1). Dunklin then asks for the court to substitute the magistrate judge's recitation of facts with Dunklin's own recitation of the facts. (*See id.*, pp. 1–8). During a telephone status conference, the court told Dunklin's counsel to come to oral argument prepared to point to each specific factual finding that Dunklin disagreed with. So at the hearing, counsel said that Dunklin also objected to these findings:

- On page 9 of the report and recommendation, "Dunklin remarked, 'Yep, got that tracker,'" should be "Gillispie remarked, 'Yep, got that tracker."

- The magistrate judge's statement on page 6 of the report and recommendation that the recording of a call between the CI and Dunklin around 5:00 pm on January 30, 2025, "seemingly captures Dunklin displaying . . . methamphetamine."

As explained in the magistrate judge's report and recommendation, written objections to the magistrate judge's report must "specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection." (Doc. 42, p. 71). Dunklin's proposed alternative statement of facts fails to meet this standard, so the court reviews for only clear error the magistrate judge's fact findings that Dunklin did not specifically object to. *See Macort v. Prem, Inc.*, 208 F. App'x 781, 784–85 (11th Cir. 2006). Having reviewed the record, the court sees no error, much less clear error, in the magistrate judge's relevant fact findings.

1. *Valuable information*: The court thus turns to the proposed fact findings that Dunklin specifically objects to. As for Dunklin's objection to the finding that the CI provided valuable information in the past, the court **OVERRULES** this objection. At the suppression hearing, Sergeant Camron Gillespie testified that Agent McKinney with the sheriff's office informed him that McKinney had worked with the CI before and deemed the CI credible based on previous controlled buys. (Doc. 34, p. 64).[1] For example, McKinney told Gillespie that the CI had provided him with around 10 ounces of cocaine. (*Id.*, p. 84). The CI had also worked with Agent Como of the Huntsville Police Department on cases involving controlled purchases and the seizure of narcotics. (*Id.*, pp. 81–82). Thus, the magistrate judge did not err in finding that the CI had previously provided law enforcement with information that led to other drug seizures.

That said, the magistrate judge recognized that Gillespie's knowledge of the CI's past performance did not by itself establish probable cause. (*See* Doc. 42, pp. 60–62). And as Dunklin's counsel pointed out at oral argument, the court has no information on how the cases the CI helped with turned out. Thus, like the magistrate judge, the court gives very little weight to the CI's past performance when deciding whether the totality of the circumstances supports a finding of probable cause.

2. *Identity of person communicating with CI*: Dunklin next objects to the magistrate judge's assertion that the person communicating with the CI was Dunklin. As the magistrate judge noted, Gillespie testified that he witnessed the CI negotiate the purchase of one pound of methamphetamine on a video call. (*See id.*, p. 54 (citing Doc. 34, pp. 9, 62)). Officers later found one pound of methamphetamine in the trunk of the Impala that Dunklin was traveling in. (*See* Doc. 45, p. 54 (citing Doc. 34, pp. 30–31)). Dunklin also arrived at the CI's house at 8:34 pm when the person the CI was communicating with said that

[1] At oral argument and during the telephone status conference with the parties, the court questioned why it should find Gillespie credible given that the magistrate judge was skeptical of Gillespie's testimony about whether a GPS tracker had been installed on the vehicle Dunklin traveled in. For two reasons, the court defers to the magistrate judge's determination that Gilespie gave credible testimony about his conversations with the CI. First, the magistrate judge presided over the suppression hearing, so he observed Gillespie's demeanor and credibility while testifying firsthand. Second, much of the record evidence, including the ALPR alerts and audio recordings, supports Gillespie's version of events.

he would get to Dunklin's house at 8:30 pm. Thus, the magistrate judge did not err in inferring that Dunklin was the person the CI was communicating with. As a result, the court **OVERRULES** this objection. But the court again notes that whether Dunklin was the person the CI was communicating with is largely irrelevant to the court's probable cause analysis, which asks whether "under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *United States v. Tamari*, 454 F.3d 1259, 1264 (11th Cir. 2006) (quotations omitted).

3. *Relationship between Pelt and Dunklin*: Dunklin also objects to the magistrate judge's statement that Pelt was Dunklin's girlfriend. But Gillespie testified that "Ms. Pelt is believed to be Dunklin's girlfriend." (Doc. 35, p. 14). So the court **OVERRULES** this objection. And the court notes that the exact nature of Pelt and Dunklin's relationship is irrelevant to the motion to suppress. What's relevant is that the CI said that Dunklin was connected to Pelt, officers believed Pelt and Dunklin would deliver the methamphetamine in Pelt's Chevy Impala, and Pelt's Chevy Impala with one male and one female passenger arrived near the CI's residence around the time officers expected the drug buy to take place.

4. *Tracker comment*: Dunklin's fourth objection is to the magistrate judge's statement that "Dunklin remarked, 'Yep, got that tracker." (*See* Doc. 45, p. 9). The court agrees that this is a typo and should read, "Gillespie remarked, 'Yep, got that tracker." The court thus **SUSTAINS** this objection and modifies the magistrate judge's findings to correct this error.

5. *Display of methamphetamine*: Dunklin's final fact-finding objection is to the magistrate judge's finding that a phone call between the CI and Dunklin just after 5:00 pm on January 30, 2025, "seemingly captures Dunklin displaying the methamphetamine." (Doc. 42, p. 6). The court **OVERRULES** this objection. Gillespie testified that some of the calls between the CI and Dunklin were video calls. (Doc. 35, p. 67). And during the audio recording referenced by the magistrate judge, you can hear the caller say, "you see I got it." (*See* Doc. 42, p. 6 (citing GX 15)). The CI responds, "how much that was?," to which the caller replies, "that's what you asked for." (*See id.*).

Gillespie testified at the suppression hearing that when the CI sent him this recording, he believed it meant that Dunklin was showing the CI something during the call. (Doc. 35, p. 70). The court thus finds that the magistrate judge reasonably inferred that the CI was shown the promised methamphetamine during this phone call.

**B. Probable Cause Determination**

The court now turns to Dunklin's objection to the magistrate judge's finding that officers' search of the vehicle did not violate Dunklin's Fourth Amendment rights. Under the automobile exception to the warrant requirement, "(1) the automobile must be readily mobile, and (2) there must be probable cause to believe that it contains contraband or evidence of a crime." *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011). Everyone agrees that the Chevy Impala officers searched was readily mobile. And as discussed, probable cause to search a vehicle exists when "under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *Tamari*, 454 F.3d at 1264 (quotations omitted). Probable cause may be based on information provided by a confidential informant "when combined with independent corroboration by the police," *see United States v. Talley*, 108 F.3d 277, 281–82 (11th Cir. 1997), or on information obtained by police during an ongoing criminal investigation, *see Lanzon*, 639 F.3d at 1300.

For example, in *Lanzon*, the defendant agreed to meet an undercover officer posing as "Tom" with the intent to have sex with the 14-year-old daughter of Tom's girlfriend. *See id.* Lanzon then drove his truck to the designated meeting place at the agreed-upon time and approached the officers who were posing as Tom and the 14-year-old, calling out "Tom, Tom." *See id.* Though Lanzon had agreed to bring colored condoms with him, the officers found no condoms during their pat down search. *See id.* So the officers searched Lanzon's truck and found multi-colored condoms, mint-flavored lubricant, and a receipt for the purchase of those items. *See id.* at 1297, 1300. Considering the totality of the circumstances, the Eleventh Circuit agreed with the district court that there was a fair probability that officers would find evidence of a crime in Lanzon's truck. *Id.* at 1300.

Applying *Lanzon*, the Eleventh Circuit also found that there was probable cause to search a vehicle in *United States v. Morley*, 99 F.4th 1328, 1336–39 (11th Cir. 2024). There, law enforcement observed Valentino Edgecombe, the target of an FBI investigation, sell half a kilogram of cocaine to a paid FBI confidential informant named Fred. *Id.* at 1331. About a month later, Edgecombe and Fred negotiated an $84,000 drug deal and agreed to meet in a Home Depot parking lot. *See id.* at 1332, 1338. Edgecombe then told Fred that his associate would bring the cocaine to the parking lot. *Id.* at 1338. Minutes later, Derrick Morley arrived and parked his vehicle close to Edgecombe and Fred's cars. *Id.* At Edgecombe's direction, Fred retrieved the cocaine from Morley's car. *See id.* Based on these facts, the circuit court held that "[t]here was more than a reasonable probability that Fred would find contraband in the exact place that Edgecombe told him to look." *Id.* at 1337.

Having considered the magistrate judge's report, Dunklin's objections, and the record evidence, the court agrees with the magistrate judge that the information officers learned during their investigation, including information from the confidential informant that officers corroborated, gave the officers probable cause to search the Chevy Impala. In January 2025, the CI told Gillespie that he could purchase methamphetamine from Dunklin who he knew as Hot Rod. (Doc. 35, p. 9). On January 28, Gillespie witnessed the CI negotiate the sale of one pound of methamphetamine in which Dunklin agreed to transport the methamphetamine from Birmingham to Huntsville for an additional $200. (*See* Doc. 42, p. 3 (citing Doc. 35, pp. 9–10); *see also* GX 7). The sale was originally supposed to take place on January 29, but the CI had several more calls with Dunklin where they agreed for the sale to take place on January 30 instead. (*See* Doc. 42, pp. 4–5). During one call that took place in Gillespie's presence, the seller explained that he got off work at 2:00 PM on January 30, so he should be able to get the methamphetamine to Huntsville around 4:00 or 5:00 PM that evening. (*See id.*; *see also* GX 12).

On January 30, the CI provided Gillespie with screenshots of Apple pay transactions with Pelt and explained that's how he normally paid Dunklin. (*See* Doc. 42, p. 5). The CI also told Gillespie that Dunklin usually traveled in either a silver Chevy sedan or a red car, and Gillespie confirmed that a silver Chevy Impala was registered to Pelt. (*See id.*). Around 5:53 PM, an ALPR alert showed that Pelt's car was still in the Birmingham area, and in a series of

phone calls, Dunklin told the CI that he'd been delayed but would still bring the methamphetamine to the CI that evening. (*See id.*, pp. 5– 6). Eventually, Dunklin told the CI to expect him at his residence around 8:30 PM. (*See id.*, p. 6; *see also* GX 18). The CI sent recordings of each of these conversations to Gillespie. (*See* GX 19). Then, at 8:32 PM, an ALPR alert showed that Pelt's Impala was in the Huntsville area. (*See* GX 3). Around 8:34 PM, the Impala parked near the CI's residence and officers ordered Dunklin and Pelt out of the vehicle. (Doc. 35, pp. 23–24).

These facts and circumstances are similar to those in *Morley* and *Lanzon*. Gillespie witnessed the CI negotiate a drug deal for a pound of methamphetamine where the seller agreed to drive the methamphetamine from Birmingham to Huntsville. The CI also provided Gillespie with screenshots of Apple Pay transactions with Pelt, which supported the CI's claim that he had previously purchased drugs through Pelt, and told Gillespie that Dunklin and Pelt would likely arrive in a silver Chevy sedan or red car. Gillespie was then able to confirm that Pelt owned a Chevy Impala, and ALPR alerts showed that the Impala was traveling from Birmingham to Huntsville on the night of the controlled buy. Finally, the Impala arrived near the designated meeting spot at 8:34 PM when recordings sent to Gillespie captured Dunklin telling the CI that he'd arrive at his residence at 8:30 PM. While the officers initiated a vehicle takedown before Pelt or Dunklin reached for the methamphetamine or communicated with the CI, that the expected vehicle arrived at the CI's residence at the expected time with the expected male and female passengers shows that there was probable cause to search the Impala.

The court recognizes that evidence of the CI's past performance is thin and acknowledges that officers had not positively identified Dunklin as the person on the phone in the CI's recordings. But as explained, the court has given very little weight to the confidential informant's past reliability in its totality of the circumstances analysis. And the court agrees with the Government that the identity of the driver or seller was not necessary to establish probable cause. What is relevant is that based on the information officers learned during their investigation, there was a fair probability that evidence of criminal activity would be found in the Impala. So Gillespie did not need to corroborate the CI's assertions about Dunklin's identity before searching the vehicle.

In sum, to have probable cause to search a vehicle, there must simply be "a fair probability that contraband or evidence of a crime will be found in the vehicle." *Tamari*, 454 F.3d at 1264. Considering the totality of the circumstances, the court agrees with the magistrate judge that the Government has made that showing here. So the court **OVERRULES** Dunklin's objections to the magistrate judge's recommendation that the court find that the automobile exception to the warrant requirement authorized the search of the Chevy Impala.

—

For these reasons, the court **ADOPTS** the magistrate judge's report (doc. 42) as modified and **ACCEPTS** the magistrate judge's recommendation. The court **DENIES** Dunklin's motion to suppress (doc. 22).

**Done** and **Ordered** on November 18, 2026.

**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE